CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
June 12, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BETH A NORTON, | : |
| Plaintiff, | : |
| v. | : |
| UNUM LIFE INSURANCE COMPANY OF AMERICA | : Civil Action No. 3:24cv00046 |
| Defendant. | : |

## COMPLAINT

COMES NOW the Plaintiff, BETH A. NORTON ("Plaintiff" or "Ms. Norton"), by counsel, and alleges:

### JURISDICTION AND VENUE

1. This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"), 29 U.S.C. § 1001, et seq., and is brought to obtain relief under Sections 502(a)(1)(B), 502(a)(3), and 502(g)(1) of ERISA, 29 U.S.C. § 1132.

2. This Court has subject matter jurisdiction over this action pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1).

3. Venue with respect to this action lies with the Charlottesville Division, pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2). Ms. Norton was domiciled in Charlottesville when the breach occurred. Therefore, the breach occurred nearest the Charlottesville Division of the United States District Court for the Western District of Virginia. Furthermore, the majority of relevant

1

treatment occurred in Charlottesville. This is, therefore, the most convenient location for the parties and witnesses, as well as the location with the easiest access to relevant evidence.

4. The UNUM insurance plan ("the Plan") at issue in this case is an employee benefit plan within the meaning of Section 3(3) of ERISA, 29 U.S.C. §1002(3), and is, therefore, subject to coverage of the Act pursuant to Section 4(a) of ERISA, 29 U.S.C. §1003(a).

## FACTS

5. In or around 2006, while working as a cardiac nurse, Ms. Norton injured her neck while lifting a patient.

6. As a result of that injury, Ms. Norton experienced progressively worsening neck pain. In 2008, Ms. Norton sought treatment for her pain and was diagnosed with cervical spinal stenosis and scoliosis.

7. At the time, Ms. Norton's treating providers told her that—due to her cervical spinal condition—she should no longer lift patients. Ms. Norton's physical limitations meant that she could no longer work as a floor nurse in a hospital.

8. As a result, Ms. Norton decided to pursue a career as a healthcare attorney. In 2011, Ms. Norton enrolled in the health law program at the University of Virginia School of Law, in Charlottesville, Virginia.

9. Unfortunately, while preparing for and attending law school, Ms. Norton discovered that sitting for long periods of time caused her significant back and neck pain. Beginning in 2012, Ms. Norton received treatment for her cervical spinal condition from Dr. Wayne Fusco ("Dr. Fusco"). Dr. Fusco continued to

treat Ms. Norton until June 2014, when Ms. Norton moved to Norfolk to begin working as a healthcare associate for Kaufman & Canoles, P.C.

10. Dr. Fusco's records acknowledged that Ms. Norton's symptoms—particularly her severe pain—were made worse by sitting, reading, driving, writing, and typing. Dr. Fusco also noted that stretching provided Ms. Norton with some pain relief, but that such relief was only temporary.

11. After moving to Norfolk, Ms. Norton received treatment for her cervical spinal condition from Dr. Scott Niblo ("Dr. Niblo"). On October 17, 2016, on Dr. Niblo's order, Ms. Norton received an MRI. This MRI demonstrated diffuse cervical disc (C5-6) bulging, narrowing of the neural foramina, C6-7 joint hypertrophy, and moderate narrowing of the left neural foramina.

12. In 2017, Ms. Norton married her husband, David. David lived in Charlottesville and Ms. Norton moved back to Charlottesville to live with him that year. Despite an exhaustive job search, however, Ms. Norton was unable to find local employment as a healthcare attorney.

13. Out of necessity, Ms. Norton accepted a position as a healthcare associate with the law firm Hancock, Daniel & Johnson in Glen Allen ("HDJ"), which was 1.25 hours away from Ms. Norton's home. As part of HDJ's benefits package offered to Ms. Norton, she received short-term disability and long-term disability coverage under the Unum Plan.

14. In or around March 2018, Ms. Norton's pain became intolerable; as a result, Ms. Norton asked her HDJ supervising attorney, Mary Malone, if she could work from home two days a week. This arrangement would minimize driving time—driving

3

exacerbated the pain caused by Ms. Norton's cervical spinal condition—and permit Ms. Norton to stretch and take breaks that would allow her to engage in other therapeutic treatments. Ms. Norton's request was granted.

15. Not even a year later, around or about the end of 2018 or beginning of 2019, Ms. Norton's supervisor informed her that she would have to return to working in the office in Glen Allen five days a week. Ms. Norton's supervisor made it known that this change was a response to other employees and managers complaining about the "preferential treatment" Ms. Norton was receiving as a result of her medical condition.

16. Ms. Norton expressed her concern that her neck condition and symptoms—including the associated pain—remained severe, but she was given no choice but to start, once again, making the daily commute to and from Glen Allen from Charlottesville.

17. As a result of being forced to sit in her car for 2.5 hours a day, Ms. Norton's pain and overall condition rapidly worsened.

18. By mid-March 2019, Ms. Norton was in severe pain from the time she woke up in the morning until she went to bed each night. Each day the pain got worse. Ms. Norton began experiencing new neurological symptoms, including but not limited to, intense, daily headaches; pain that shot down through her left shoulder, down her arm, and into to her hand; weakness in her left hand; tremors; intense burning in her head, neck and down her entire spine; intense middle back stiffness; chest pain; and lower back and hip pain that radiated down her legs.

4

19. Ms. Norton did not begin experiencing most of these symptoms until she was forced to resume her daily commute. Ms. Norton's pain was far more intense than it had ever been. As a result of her deteriorating condition, Ms. Norton began to suffer from acute depression that eventually led to her experiencing suicidal ideations.

20. On April 1, 2019, Dr. Scott Wagner told Ms. Norton that she needed to take time off to rehabilitate, and that she could not make the daily commute to Glen Allen anymore.

21. Based on Dr. Wagner's recommendations and after discussing the issue with her family, on or around April 2, 2019, Ms. Norton decided to resign from HDJ. At that time, Ms. Norton made it known to HDJ that she was resigning because of her worsening condition, and the pain and physical limitations she was suffering from as a result.

22. At the time, HDJ did not offer any concessions or accommodations. Although not provided the option to work part-time or remotely, Ms. Norton informed her manager of her intention to finish her ongoing projects from home over the coming weeks.

23. While working from home, Ms. Norton continued to experience severe pain and neurological symptoms. The only way Ms. Norton could alleviate her severe pain was by lying flat on the floor; within minutes of resuming work at her computer, however, Ms. Norton would once again begin suffering from the extreme pain and symptoms associated with her condition. extreme symptoms would return.

24. Ms. Norton was only able to work 2 or 3 hours a day during this period. She was, however, able to complete all of her assigned HDJ projects to her supervisor's satisfaction.

25. Ms. Norton's last day of work with HDJ was April 21, 2019.

26. On April 22, 2019, Ms. Norton saw her primary care physician, Dr. Mark Lepsch ("Dr. Lepsch"). Dr. Lepsch ordered standing x-rays of Ms. Norton's cervical spine. The resulting x-rays showed: sigmoid scoliosis, extensive discogenic disease at C5-6 and C6-7, mild discogenic disease at C4-5 and C7-T1, mild retrolisthesis at C5-6 C6-7, osteoarthritis at all levels, reversal of curvature, and neural foraminal stenosis at C5-6 C6-7. The overall "Impression" given by the x-ray images was one of: "Discogenic disease and osteoarthritis."

27. This was the first time Ms. Norton had been diagnosed with discogenic disease at levels C7-T1, retrolisthesis, and osteoarthritis at all levels.

28. The x-rays also demonstrated neural foraminal stenosis; Dr. Lepsch indicated that the presence of this condition explained Ms. Norton's worsening neurological symptoms, particularly the pain, numbness and tingling she had been experiencing in her shoulders, arm, hand, and chest.

29. In an attempt to alleviate some of Ms. Norton's symptoms, Dr. Lepsch prescribed a muscle relaxant, prednisone, and tramadol. He also referred Ms. Norton for an MRI and to Neurosurgery—to ascertain whether any surgical options were available to treat Ms. Norton's condition.

30. Dr. Lepsch told Ms. Norton that he agreed with Dr. Wagner; she should not work while her rehabilitative and treatment options were explored.

6

31. Around this time, Ms. Norton filed a claim for Short Term Disability benefits (the "Benefits") based on the Unum Plan made available to her through HDJ.

32. Soon after filing the claim, Unum confirmed receipt of the claim and informed Ms. Norton that it would be requesting recent records from her treating providers.

33. Ms. Norton signed, via electronic signature, a form authorizing Unum to request relevant records from Dr. Wagner and Dr. Lepsch. Ms. Norton reasonably relied on Unum's assurances that it would obtain Ms. Norton's records on her behalf. At no point did Unum inform Ms. Norton that she was expected to request her own medical records.

34. On May 10, 2019, Unum wrote to Ms. Norton informing her that it had requested records and Attending Physician Statements from Dr. Lepsch and Dr. Wagner.

35. That same day, May 10, 2019, Dr. Lepsch completed the Attending Physician Statement and returned it to Unum. That statement included the following information:

   a. Dr. Lepsch advised Ms. Norton at her last office visit on April 22, 2019 to stop working;

   b. Ms. Norton's primary diagnosis was Cervical Radiculopathy;

   c. Her treatment plan included tramadol, Flexeril, prednisone, physical therapy, x-rays, an MRI, and a neurosurgery consult;

   d. Ms. Norton was not advised to return to work;

   e. Her expected return to work date was unknown;

   f. Her current restrictions and limitations included: sitting at a desk and driving for extended periods.

7

36. Also on May 10, 2019, Ms. Norton had an MRI of her cervical spine which demonstrated the following:

> *Findings: Mild degenerative endplate marrow signal changes are noted at C5-6 and C6-7. Vertebral body heights are preserved. There is straightening of the normal cervical lordosis with trace retrolisthesis of C5-6. Diffuse disc desiccation is present, with severe loss of disc height at C6-7.*
>
> *C2-C3: There is mild facet arthropathy, without significant central spinal canal or neural foraminal stenosis.*
>
> *C3-4: There is a small posterior disc osteophyte complex and mild facet arthropathy, without significant central spinal canal or neural foraminal stenosis.*
>
> *C4-5: There is a small posterior disc osteophyte complex with a superimposed shallow right foraminal protrusion. Mild facet arthropathy is noted as well. There is no significant central spinal canal or neural foraminal stenosis.*
>
> *C5-6: There is a moderate posterior disc osteophyte complex with moderate facet and uncovertebral degenerative changes. These findings result in mild central spinal canal stenosis and moderate bilateral neural foraminal stenosis.*
>
> *C6-7: There is a small posterior disc osteophyte complex with left greater than right facet uncovertebral hypertrophy. These findings result in mild left neural foraminal stenosis. There is no significant central spinal canal or right neural foraminal stenosis.*
>
> *C7-T1: There is mild facet arthropathy, without significant central spinal canal or neural foraminal stenosis.*

37. When compared to the MRI from 2016, the 2019 MRI and x-ray findings demonstrated a significant—and rapid—worsening of Ms. Norton's spinal condition.

38. On June 12, 2019, Unum wrote to Ms. Norton and informed her it had received a response from her providers, and had subsequently written to them requesting further clarification.

39. On June 18, 2019, Dr. Lepsch's office responded to Unum, stating that they could not process the request for further clarification using the authorization form Unum had provided.

40. Nearly three weeks later, on July 5, 2019, Unum wrote to Ms. Norton and asked that she complete an enclosed special authorization provided by Dr. Lepsch's office in order to re-request those records. Ms. Norton signed and returned the authorization immediately. Unum received the completed authorization on July 10, 2019.

41. Six days later, on July 16, 2019, Unum re-requested medical records using the special form.

42. Unum claims it received a copy of the requested records from Dr. Lepsch, on July 29, 2019, but that the records provided were "completely blank." Ms. Norton had no control over this alleged error, and Unum failed to notify Ms. Norton of the omission or give her any opportunity to assist in correcting it. There is no evidence in the record that Unum informed Dr. Lepsch's office of the error, much less allow them time to correct it. Instead, Unum simply closed Ms. Norton's claim.

43. In a July 30, 2019 letter to Ms. Norton, Unum stated that it was denying and closing Ms. Norton's claim, because it "did not receive the requested information" from Dr. Lepsch and Dr. Wagner.

44. Ms. Norton has filed three internal appeals with Unum since it originally denied and closed her claim.

45. In its latest Adverse Decision dated April 6, 2021 ("the Final STD Denial"), Unum admitted that it had received medical records from "multiple treating providers beginning May 15, 2019." This statement stands in direct contradiction to Unum's prior claim that it had not received any records as of July 30, 2019.

46. Unum provided no reasonable basis for its denial. Instead, its entire reasoning was based on fabrications and mischaracterizations of the evidence. The self-serving opinion of Unum and its reviewers were entirely inconsistent with the evidence and the opinions of Ms. Norton's treating providers, whose opinions carry greater weight as a matter of law.

47. For example, Unum acknowledges in its latest denial that Ms. Norton's profession requires her to sit for most of the day. Unum then determines, without any substantive basis, that Ms. Norton can tolerate a full-time, sedentary job; this is entirely inconsistent with the observations and medical opinions of Ms. Norton's treating providers. The records of all of Ms. Norton's relevant healthcare providers agree on the fact that Ms. Norton cannot tolerate prolonged periods of sitting or working at a computer.

48. As another example, in one of its denials, Unum fraudulently asserted that "the MRI of the cervical shows ONLY age-appropriate changes with no evidence of stenosis or nerve root involvement." This is an outright fabrication, as the 2019 imaging clearly shows evidence of central canal stenosis, foraminal stenosis, and changes that far exceed "age-appropriate changes."

49. In its Final STD Denial, Unum cherry-picked excerpts from Ms. Norton's medical records. Unum took these out-of-context excerpts from Ms. Norton's medical

records and fabricated a narrative that justified their continued denial of Ms. Norton's STD claim.

50. Unum did not perform a fair and unbiased investigation of Ms. Norton's claims. Instead, Unum chose to act in bad faith and intentionally mischaracterized the few positive comments in Ms. Norton's medical record as being representative of her overall condition.

51. In short, since filing her STD claim, Ms. Norton has provided Unum with hundreds of pages of records substantiating her STD claim. Ms. Norton has provided objective medical evidence demonstrating her physical disability, and statements from her treating providers that Ms. Norton is Disabled as defined by the Plan.

52. Unum's unreasonable determination that Ms. Norton did not meet the definition of "Disabled" under the Plan has also precluded her from receiving long-term disability (LTD) benefits due to her under the Plan, because it requires a disability determination identical to that required by the terms of the LTD plan.

53. This case was originally filed on September 16, 2022.

54. On March 15, 2023, the parties filed a Stipulation of Dismissal Without Prejudice to permit Ms. Norton the ability to exhaust her administrative remedies associated with her claim for long-term disability benefits under the Plan.

55. Ms. Norton subsequently filed her claim for LTD benefits with Unum and has exhausted her administrative remedies therewith, receiving the final denial of her second level of appeal, in a letter dated January 5, 2024 (the "Final LTD Denial").

56. Unum's reason for issuing the Final LTD Denial is flawed because, similar to the reviewers regarding Ms. Norton's STD claim denials, the claims reviewer, Kevin Kohan, D.O., cherry-picked facts, omitted many relevant and significant facts, made outright misrepresentations of fact, and failed to address the existence and concomitant effects of Ms. Norton's comorbidities,

57. Furthermore, Unum's Final LTD Denial failed to address the extent to which her pain and other symptoms were exacerbated by working in an occupation that required her to sit for 8-10 hours per day.

58. The following non-exhaustive examples illustrate how Unum's reviewer repeatedly mischaracterized the facts of Ms. Norton's claim, including the medical record:

   g. Unum stated that Ms. Norton "reported worsening symptoms in April 2019, not attributed to any specific injury or significant change." As stated previously in this Complaint—and in the medical record—Ms. Norton's condition can be unequivocally attributed to her 2006 injury. Additionally, the records provided to Unum showed that Ms. Norton's worsening symptoms directly coincided with a "significant change" in Ms. Norton's physical condition. HDJ's decision to claw back Ms. Norton's remote work accommodation and require her to make a multi-hour daily commute was also a "significant change."

   h. Unum's letter goes on to state that "there is no evidence of nerve root impingement." Yet, Dr. Niblo's records from October 3, 2016 already reflected the fact that Ms. Norton's "[m]aximum cervical compression test

for cervical nerve root compression [was] positive with radiating pain on the left and [was] positive with localized pain on the right." Records reflect that by 2019, the multi-level nerve root impingement had significantly worsened.

i. Unum's letter states that "[t]here are no documented findings such as weakness or sensory loss of the upper extremities." Yet, once again, the record shows that Dennis G. Vollmer, MD ("Dr. Vollmer"), a neurosurgeon with University of Virginia Health System, made the following observation: "I did feel that her left grip may be less strong than the right." Dr. Vollmer also stated that sensory testing showed "some subjective loss of sensation in the ulnar 2 digits of the left hand."

j. Kevin Kohan, D.O, in Unum's review, reasoned that Ms. Norton's "diagnosis of occipital neuralgia would not have precluded her from the listed occupational demands during the dates in question. [. . .] The records do not indicate that she sought any urgent treatment for severe headache pain." The record reflects the fact that Ms. Norton sought treatment for her headache pain in conjunction with her other spinal issues. Whether or not Ms. Norton sought urgent treatment, however, is irrelevant to the determination of disability under the Plan and Kevin Kohan's reasoning is simply a tautological red herring.

59. Ms. Norton has made every effort to mitigate the damages in this case. Ms. Norton attempted to find part-time legal jobs, but after an extensive search, she was unable to find one. Therefore, Ms. Norton started her own practice, which

permits her to continue practicing law while allowing her to control her work schedule and find time to take breaks for therapeutic activities, such as chiropractic treatment, stretching, using ice or heat, and/or using one of her therapeutic devices, such as her traction machine or TENS unit.

60. Ms. Norton works as much as she can, but she continues to have limitations and growing a practice takes time, so she has experienced a near total diminishment in her compensation since leaving her firm-based, full-time attorney position, and has taken on significant debt to pay her business and personal expenses, including the cost of her continuing treatment.

## RELEVANT LAW AND VIOLATIONS

61. Plaintiff incorporates paragraphs 1 through 56 as though fully set forth herein.

62. Section 502(a)(1)(B) of ERISA states, in relevant part: "A civil action may be brought by a…beneficiary…to recover benefits due to him under the terms of his plan" or "to enforce his rights under the terms of the plan…" 29 U.S.C. §1132(a)(1)(B).

63. Section 502(a)(3) of ERISA states, in relevant part, that a beneficiary may bring an action "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any rprovisions of this subchapter of the terms of the plan." 29 U.S.C. §1132(a)(3)(B).

64. Section 502(g)(1) of ERISA states, in relevant part: "In any action under this subchapter by a beneficiary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. §1132(g)(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter an Order:

A. Declaring that Ms. Norton was Disabled and therefore entitled to short-term disability benefits under the Plan on April 21, 2019;

B. Ordering Unum to pay to Ms. Norton the amount of her past-due STD benefits under the plan from April 21, 2019 to October 21, 2019, which is $44,625.00, and enforcing all her other rights under the Plan during that time;

C. Declaring that Ms. Norton remained Disabled and was therefore entitled to long-term disability (LTD) benefits under the Plan on October 21, 2019, and that she remains Disabled and entitled to LTD benefits today;

D. Ordering Unum to pay to Ms. Norton the amount of her past-due LTD benefits under the Plan since October 21, 2019, which is more than $300,000, and enforcing Ms. Norton's rights under the Plan from October 21, 2019 to the present;

E. Ordering Unum to reimburse Ms. Norton for her legal fees and costs to enforce her rights under the Plan, including but not limited to, reasonable attorneys' fees, as authorized by 29 U.S.C. §1132(g);

F. Ordering Unum to pay pre and post-judgement interest on any monetary award due to Ms. Norton;

G. Ordering any other appropriate equitable relief as is appropriate and just.

BETH A. NORTON

By: _____

/s/
Vincent W.P. Prior (VSB #99513)
Norton Health Law, P.C.
1441 Sachem Place, Suite 2
Charlottesville, Virginia 22901
Telephone: (434) 978-3100
Email: vprior@nortonhealthlaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on Jun 12, 2024, a true and accurate copy of this pleading was mailed, first class, postage prepaid to:

Corporation Service Company
Registered Agent of Unum Life Insurance Company of America
100 Shockoe Slip, Floor 2
Richmond, VA, 23219-4100
(*Registered Agent for Defendant*)

Secretary, U.S. Department of Labor
200 Constitution Ave NW
Washington, DC 20210